# UNITED STATES DISTRICT COURT
## IN THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

FEDERAL HOME LOAN
MORTGAGE CORPORATION,

     Plaintiff/Counter-Defendant,              Case No. 2:12-cv-12131
                                          HON. JULIAN ABELE COOK

v.

ENYKA M. MATTHEWS-GAINES,
AND RICO R. GAINES,

     Defendants/Counter-Plaintiffs.

---

## DEFENDANTS/COUNTER-PLAINTIFFS' RESPONSE BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR JUDGMENT ON THE PLEADINGS

# TABLE OF CONTENTS

STATEMENT OF QUESTIONS PRESENTED ................................................................. iii

INDEX OF AUTHORITIES CITED .......................................................................... iv

INTRODUCTION ................................................................................................1

STATEMENT OF FACTS ......................................................................................1

LEGAL ANALYSIS .............................................................................................2

STANDARD OF REVIEW .....................................................................................2

ARGUMENT .....................................................................................................2

I.    COUNTER-DEFENDANTS BREACHED THE TRIAL MODIFICATION
      CONTRACT ...............................................................................................2

II.   AS A STATE ACTOR, FREDDIE MAC IS SUBJECT TO THE FIFTH
      AMENDMENT REQUIREMENTS FOR NOTICE AND A HEARING PRIOR
      TO FORECLOSURE ......................................................................................6

III.  COUNTER-PLAINTIFFS HAVE PROPER STANDING TO CHALLENGE
      THE LEGITIMACY OF THE FORECLOSURE AND RAISE BREACH OF
      CONTRACT ..............................................................................................17

IV.   COUNTER-PLAINTIFFS' COMPLAINT ALLEGES SUFFICIENT FACTS
      WITH ADEQUATE SPECIFICITY TO SUPPORT THEIR CLAIMS ...............................19

CONCLUSION AND RELIEF .................................................................................19

CERTIFICATE OF SERVICE

## STATEMENT OF QUESTIONS PRESENTED

I.      WHETHER COUNTER-DEFENDANTS BREACHED THE TRIAL MODIFICATION CONTRACT?

II.     WHETHER, AS A STATE ACTOR, FREDDIE MAC IS SUBJECT TO THE FIFTH AMENDMENT REQUIREMENTS FOR NOTICE AND A HEARING PRIOR TO FORECLOSURE?

III.    WHETHER COUNTER-PLAINTIFFS HAVE PROPER STANDING TO CHALLENGE THE LEGITIMACY OF THE FORECLOSURE AND RAISE BREACH OF CONTRACT?

IV.     WHETHER COUNTER-PLAINTIFFS' COMPLAINT ALLEGES SUFFICIENT FACTS WITH ADEQUATE SPECIFICITY TO SUPPORT THEIR CLAIMS?

# INDEX OF AUTHORITIES

**CASES**

*Bell Atlantic Co. v. Twombly*, *550 U.S. 544, 127* S. Ct. 1955, 167 L.Ed 2D 929 (2007) ........................2

*Bolone v. Wells Fargo Home Mortg., Inc.*, 2011 U.S. Dist. LEXIS 94714, 11-15 ( E.D. Mich. Aug. 24, 2011) ................................................................................................................................3, 4, 6

*Bolone v. Wells Fargo Home Mortg., Inc.*, 2012 U.S. Dist. LEXIS 34272 (E.D. Mich. March 14, 2012) ........................................................................................................................................4

*Federal Sav. & Loan Ins. Corp. v. Locke*, 718 F. Supp. 573, 579-580 (W.D. Tex. 1989) .....................9

*Fuentes v. Shevin*, 407 U.S. 67, 92-97 (U.S. 1972) ............................................................................15

*Gaff v FDIC*, 919 F2d 384, 387 (6th Cir 1990) ................................................................................10

*Gilbert v Homar*, 520 U.S. 924, 117 S. Ct 1807, 134 L. Ed. 2d 120 (1997) ....................................15, 16

*Herron v Fannie Mae*, 10-00943, U. S. District Court for the District of Columbia .............................8

*Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 400 (U.S. 1995) ................................6, 11, 12, 14

*Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 433-434 (U.S. 1982) ..................................................14

*Michaels v. Baker*, 206 Mich. App. 644, 650, 651 (1994) ........................................................................2

*Nett v. Wells Fargo Home Mortg. Inc.*, 2011 U.S. Dist. LEXIS 42846, 6-9 (E.D. Mich. Apr. 20, 2011) ........................................................................................................................................19

*O'Melveny & Myers v Federal Deposit Insurance Corporation,* 512 U.S. 79; 114 S Ct 2048; 129 L. Ed 2d 67 (1994) ........................................................................................................................8

*Rainey v. United States Bank Nat'l Ass'n*, 2011 U.S. Dist. LEXIS 123347, 5-8 (E.D. Mich. Oct. 25, 2011) ................................................................................................................................18

*Sniadach v. Family Fin. Corp.*, 395 U.S. 337, 341-342 (U.S. 1969) ....................................................15

*Sutton v U.S. Small Business Administration*, 92 Fed. Appx 112, 2003 US App LEXIS 25694 ...........16

*Thomas v. Leja*, 187 Mich App, 418, 422; 68 NW2d 58 (1991) ............................................................2

*Trigo v. Federal Deposit Ins. Corp.,* 847 F.2d 1499, 1503 (11th Cir. Fla. 1988) ....................................9

*U.S. v Beszborn*, 21 F3d 62 (5th Cir 1994) ......................................................................................9

*Wigod v. Wells Fargo Bank, N.A.,* 2012 U.S. App. LEXIS 4714, 18-19 (7th Cir. Ill. Mar. 7, 2012) ...5, 6


**CONSTITUTIONAL PROVISIONS**

U.S. Constitution, 5th Amendment ....................................................................................................14, 17


**FEDERAL AUTHORITIES**

Federal Housing Finance Authority (FHFA) ..........................................................................................6, 7

Housing and Economic Recovery Act of 2008 (HERA), Public Act 110-289 ........................................6, 7


**FEDERAL RULES**

Fed.R.Civ.P. Rule 9(b) ....................................................................................................................19

Fed.R.Civ.P. Rule 12(b)(6) ..................................................................................................................2

Fed.R.Civ.P. Rule 12(c) ..............................................................................................................2, 19, 20


**STATUTORY PROVISIONS**

MCL 600.3204 ................................................................................................................................19


**MICHIGAN COURT RULES**

MCR 2.116(I)(2) ..................................................................................................................................6

## INTRODUCTION

Counter-Defendant Federal Home Loan Mortgage Corporation (Freddie Mac) and its predecessor servicer Wells Fargo, like many lenders and servicers of predatory subprime loans have refused to take responsibility for its role in catalyzing defaults and subsequent foreclosures based upon its unconscionable conduct.  In fact, the problem with lenders being renegades with respect to improper foreclosures catalyzed a federal investigation resulting in enforcement action and consent agreements that included a cease and desist order of improper foreclosure and servicing practices. Our federal regulatory agencies have identified the pattern and practice of improper servicing and foreclosures[1].  The instant matter is the perfect example of improper practices related to servicing and foreclosure without compliance with state and federal law.

## STATEMENT OF FACTS

Counter-Plaintiffs' sought loss mitigation assistance from their servicer Wells Fargo in the form of a loan modification.  Counter-Defendants' predecessor servicer Wells Fargo provided a trial modification, fully executed and signed by Counter-Plaintiffs and the servicer Wells Fargo (Docket No. 1, Counter-Plaintiffs' Complaint, Exhibit 7.).  After making timely payments and expecting a permanent modification.  Counter-Plaintiffs payments were rejected and they were advised to reapply.  Instead of obtaining a permanent modification, Counter-Plaintiffs were defaulted and foreclosed upon.  Counter-Plaintiffs were even more shocked to learn Freddie Mac, a government entity charged with assisting borrowers to retain homeownership actively participated in divesting them of their property rights.

---

[1] Freddie Mac predecessor servicer is currently under a federal consent orders based upon improper foreclosure and servicing practices. (**Exhibit 1,** Wells Fargo Consent Order)

**LEGAL ANALYSIS**

**STANDARD OF REVIEW**

**Judgment on the Pleadings**

The analysis for a motion brought pursuant to Fed.R.Civ.P. Rule 12(c) is the same analysis for motion brought pursuant to Fed.R.Civ.P. Rule 12(b)(6).   In evaluating a complaint under Fed.R.Civ.P. Rule 12(b)(6), the court determines whether a claim upon which relief can be granted has been established. In a motion to dismiss pursuant to Fed.R.Civ.P. Rule 12(b)(6) a plaintiff must include enough facts to state a claim to relief that is plausible on its face. *Bell Atlantic Co. v. Twombly*, 550 U.S. 544, *127* S. Ct. 1955, 167 L.Ed 2D 929 (2007).   The complaint must be liberally construed, assuming the facts therein are true and drawing all reasonable inferences from those facts in the plaintiff's favor. *Id. at 1964-1965*.   A complaint should not be dismissed simply because a court is doubtful that the plaintiff will be able to prove all the factual allegations contained therein. *Id.*

**I.    COUNTER-DEFENDANTS   BREACHED   THE   TRIAL MODIFICATION CONTRACT**

Counter-Plaintiffs had a *valid* contract with Counter-Defendants.   The fundamental principles of contract formation apply to create any contractual obligation.   The essential elements of a contract are (1) parties are competent to contract, (2) a proper subject matter, (3) legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation. *Thomas v. Leja*, 187 Mich App, 418, 422; 68 NW2d 58 (1991).  In *Michaels v. Baker*, 206 Mich. App. 644, 650, 651 (1994), the Michigan Court of Appeals held that the rule in Michigan is that one who first breaches a contract cannot maintain an action against the other contracting party for subsequent breach or failure to perform.  The rule only applies when the initial breach is substantial.

In the instant matter, Counter-Defendants breached the trial modification contract by accepting the payments, advising Counter-Plaintiffs they successfully completed the trial

modification, and then taking the Counter Plaintiff's property to foreclosure. (*See,* Docket No. 1, Plaintiff's Complaint, Exhibits 7-9)   Counter-Plaintiffs are entitled to relief for Counter-Defendants' contractual breach, and Counter-Defendants had no standing to take any action including foreclosure under the contract, as Counter-Defendants substantial and material breach occurred first.

The Counter-Defendants had a duty to comply with the well-established principles of contract law.  The fact that Counter-Plaintiffs entered into a trial modification contract does not alleviate Counter-Defendants of the duty to adhere to the express terms of a written contract or avoid compliance with contract principles to avoid a substantial breach.

**A.     A Modification Plan Is A Contract.   Breach Of The Modification Agreement Precludes A Foreclosure**

In a recent federal case in Michigan, *Bolone v. Wells Fargo Home Mortg., Inc.*, 2011 U.S. Dist. LEXIS 94714, 11-15 ( E.D. Mich. Aug. 24, 2011), the Court held that a trial modification agreement constituted a contract, and a breach of the agreement by the lender constitutes a defense to foreclosure.

The Court held in *Bolone*, supra:

> For Plaintiff to state a breach of contract claim, the Trial Period Plan (TPP) must meet the essential elements of a contract... A contract requires parties competent to contract, proper subject matter, legal consideration, mutuality of agreement, and mutuality of obligation.  After showing that a valid contract exists, the plaintiff must show: (1) the terms of the contract, (2) a breach of one or more of those terms, and (3) the injury to the plaintiff caused [*12] by the breach.
>
> Plaintiff argues that Defendants and Plaintiff entered a written agreement—the TPP. Plaintiff maintains that she adhered to the TPP, as opposed to Defendants, who at the end of the TPP denied her a permanent modification and began foreclosure proceedings on her home. Plaintiff asserts that Defendants simply breached the contract…
>
> After reviewing Defendant's cited legal authority, the Court finds that it is distinct from the instant case and that Plaintiff establishes a likelihood of success on her breach of contract claim. First, in *Hart*, the plaintiff was alleging that the defendant should have modified her loan according to the language in HAMP. 735 F. Supp. 2d at 746-47. In *Hart*, similar to

Defendants' other cited legal authority, the court held that the plaintiff could not bring a cause of action under HAMP to require modification of the mortgage. Id. at 748. Contrary to the plaintiff in *Hart*, Plaintiff and Wells Fargo actually entered into a TPP. According to the language in the TPP, Wells Fargo would permanently modify Plaintiff's mortgage if she complied with the terms of the TPP. Also contrary to the plaintiff in *Hart*, Plaintiff is asserting that Wells Fargo breached the terms of the TPP by not permanently modifying her loan, rather than asserting that Wells Fargo violated the HAMP guidelines. Defendants also have not shown that HAMP would preempt Plaintiff from asserting a breach of the TPP.

Second, Plaintiff shows a substantial likelihood of establishing the essential elements of her breach of contract claim. Plaintiff has shown the existence of a valid contract, the TPP; that Defendants allegedly breached terms of that contract by failing to permanently modify her mortgage; and as a result Plaintiff suffers the risk of being evicted from her home. See *Bosque v. Wells Fargo Bank*, 762 F. Supp. 2d 342, 351-52 (D. Mass. Jan. 26, 2011) (finding that trial modification plans are valid contracts supported by consideration due to additional conditions in the TPP that were imposed on a plaintiff). Plaintiff also has shown that she made the required TPP monthly payments and purportedly followed the other terms in the TPP. Defendants fail to refute that they did not receive and accept monthly TPP payments for the months of April, May, and June; additional monthly payments for the months of July and August after the TPP expired; or that Plaintiff breached the terms of the TPP. Moreover, the language in the TPP provides that Defendants will suspend any foreclosure proceedings while Plaintiff is in compliance with the TPP. As such, the Court finds that Plaintiff has shown a likelihood of success on the merits with respect to her breach of contract claim. See *Williams v. Geithner*, No. 09-1959, 2009 U.S. Dist. LEXIS 104096, 2009 WL 3757380, at *3 (D. Minn. Nov. 9, 2009) [*15] (finding that "[i]f the borrower remains current throughout the trial period, the servicer must then provide a loan modification"); *Wells Fargo v. Meyers*, 30 Misc. 3d 697, 913 N.Y. S. 2d. 500, 504 (Nov. 10, 2010) (finding that homeowners that complied with all requirements of a trial modification plan were entitled to compelling specific performance of the modification agreement by Wells Fargo ).  (**Exhibit 2,** *Bolone v. Wells Fargo Home Mortg., Inc.*, 2011 U.S. Dist. LEXIS 94714, 11-15 (E.D. Mich. Aug. 24, 2011)).

The Court in *Bolone* further denied the defendant's motion for summary judgment on this issue denying the defendant Wells Fargo's motion for summary judgment. (**Exhibit 3**, *Bolone v. Wells Fargo Home Mortg., Inc.*, 2012 U.S. Dist. LEXIS 34272 (E.D. Mich. March 14, 2012))

This position has been followed by the 7th Circuit US Court of Appeals, which held the plaintiff borrower in that matter had raised a viable breach of contract under the trial modification agreement stating:

4

"Wigod is in the third group, basing claims directly on the TPP Agreements themselves. These plaintiffs avoid Astra because they claim rights not as third-party beneficiaries but **as parties in direct privity with their lenders or loan servicers**. In these third-generation cases, district courts have split. Including first and second-generation cases, about 50 of the courts granted motions to dismiss in full. See, e.g., *Nadan v. Homesales, Inc*., No. CV F 11-1181 LJO SKO, 2011 U.S. Dist. LEXIS 89946, 2011 WL 3584213 (E.D. Cal. Aug. 12, 2011); *Vida v. OneWest Bank, F.S.B.,* No. 10-987-AC, 2010 U.S. Dist. LEXIS 132000, 2010 WL 5148473 (D. Or. Dec. 13, 2010). In 30 or so [*19] cases, courts denied the motions in full or in part, allowing claims based on contract, tort, and/or state consumer fraud statutes to go forward. See, e.g., *Allen v. CitiMortgage, Inc*., No. CCB-10-2740, 2011 U.S. Dist. LEXIS 86077, 2011 WL 3425665 (D. Md. Aug. 4, 2011); Bosque v. Wells Fargo Bank, N.A., 762 F. Supp. 2d 342 (D. Mass. 2011). For particularly instructive discussions of some of the issues involved in these cases, compare *In re Bank of America Home Affordable Modification Program (HAMP) Contract Litigation, No*. 10-md-02193-RWZ, 2011 U.S. Dist. LEXIS 72079, 2011 WL 2637222, at *3-6 (D. Mass. July 6, 2011) (multi-district litigation) (denying defendant's motion to dismiss claims for breach of contract and violation of state consumer protection statutes), with *Bourdelais v. J.P. Morgan Chase*, No. 3:10CV670-HEH, 2011 U.S. Dist. LEXIS 35507, 2011 WL 1306311, at *3-6 (E.D. Va. Apr. 1, 2011) (dismissing claims for breach of contract). See generally John R. Chiles & Matthew T. Mitchell, Hamp: An Overview of the Program and Recent Litigation Trends, 65 Consumer Fin. L. Q. Rep. 194, 195 (2011) (examining the "current litigation trends in this recent spate of HAMP-related lawsuits")." (*Wigod v. Wells Fargo Bank, N.A.,* 2012 U.S. App. LEXIS 4714, 18-19 (7th Cir. Ill. Mar. 7, 2012)).

Moreover the Restatement of Contracts 2d 89 provides,

### 89. MODIFICATION OF EXECUTORY CONTRACT

A promise modifying a duty under a contract not fully performed on either side is binding

(a) if the modification is fair and equitable in view of circumstances not anticipated by the parties when the contract was made; or

(b) to the extent provided by statute; or

vis-à-vis to the extent that justice requires enforcement in view of material change of position in reliance on the promise.

In this case, Counter-Plaintiffs had a trial modification agreement and made the required payments, and received a letter they successfully completed the trial modification payment plan period. Counter-Plaintiffs were in privity with the lender. Instead of trial modification

agreement being honored, Counter-Plaintiffs' home was taken to foreclosure and **sold at the sheriff's sale.** Counter-Plaintiffs, just like the borrowers in *Bolone* and *Wigod* were illegally foreclosed upon based upon Counter-Defendants' breach of contract.   Counter-Defendants' lengthy and extensive HAMP argument is misplaced.   Counter-Plaintiffs' did not raise HAMP provided a duty to modify, but rather Counter-Defendants breach the contract **after Counter-Plaintiffs complied with the express contract via the trial modification agreement signed by Wells Fargo.** Counter-Plaintiffs sets forth a prima facie case of breach of contract, and Counter-Defendants' motion to dismiss should be denied.

## II.   AS A STATE ACTOR, FREDDIE MAC IS SUBJECT TO THE FIFTH AMENDMENT REQUIREMENTS FOR NOTICE AND A HEARING PRIOR TO FORECLOSURE

In *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 400 (U.S. 1995), cited as controlling authority by Counter-Defendants in the present case relative to Plaintiffs' claim of a deprivation of property in violation of the 5th amendment to the U.S. Constitution, the U.S. Supreme Court held the following as to when a government corporation becomes a state actor for constitutional purposes:

> We hold that where, as here, the Government creates a corporation by special law, for the furtherance of governmental objectives, and retains for itself permanent authority to appoint a majority of [***923] the directors of that corporation, the corporation is part of the Government for purposes of the [**975] First Amendment.

## A.   Freddie Mac Was Fully Taken Over By The FHFA, An Agency Of The U.S. Government In 2008

In the present case, while Counter-Defendant Freddie Mac was formerly considered a private corporation, albeit with a special relationship to the federal corporation, it was fully taken over by the federal government and placed under control of Intervening Counter-Defendant, the Federal Housing Finance Agency, pursuant to the Housing and Economic Recovery Act of 2008 (HERA), Public Act 110-289.  The Federal Housing Finance Authority (FHFA) was created by the Housing and Economic Recovery Act of 2008 (HERA), Public Law 110-289, an act enacted

6

by Congress "[T]o provide needed housing reform and for other purposes."  Section 1101 of the HERA states that the FHFA "shall be an independent agency of the Federal Government."

Section 1101 of the HERA establishes the position of the Director of the FHFA.  Section 1101 of the HERA provides that the Director of the FHFA shall have authority over Counter-Defendant Freddie Mac.  Section 1313 of the HERA provides that the principal duties of the Director of the FHFA are to oversee the prudential operations of Freddie Mac in order to foster liquid, efficient, competitive and resilient national housing markets (including activities relating to mortgages on housing for low and moderate income families.)  Section 1313 also provides that the Director of FHFA is to insure that Freddie Mac is operated consistent with the public interest.

A September 7, 2008 statement by FHFA Director James Lockhart noted that as conservator, the FHFA operates Fannie Mae and Freddie Mac, and assumed the power of the Board and management of Fannie Mae.  (**Exhibit 4**, 9/7/2008 Statement by James Lockhart)

A Fact Sheet issued by the FHFA notes that as conservator, FHFA controls and directs the operation of Freddie Mac and conducts all the business of the company, with all the powers of the shareholders, directors and officers of the company.  The fact sheet further states that there is no exact time frame that can be given as to when the conservatorship of the FHFA over Fannie Mae may end.  (**Exhibit 5**, FHFA fact sheet)

The Congressional Budget Office treats Freddie Mac as part of the federal government with their operations reflected in the federal budget. (**Exhibit 6**, CBO's Budgetary Treatment of Freddie Mac and Fannie Mae)

The fact that the Federal Housing Finance Agency, an agency of the federal government, now exercises complete control over Freddie Mac is not disputed by Counter-Defendants.  For example, Freddie Mac's 10k report filed with the Securities and Exchange Commission on February 27, 2012, states:

> We continue to operate under the direction of the FHFA, as our Conservator.  We are also subject to certain constraints on our business

activities imposed by the Treasury due to the terms of, and Treasury's rights under, the Purchase Agreement.  We are dependent upon the continued support of the Treasury and FHFA in order to continue operating our business.  Our ability to access funds from Treasury under the Purchase Agreement is critical is keeping us solvent and avoiding the statutory appointment of a receiver by FHFA under mandatory receivership provisions.  The conservatorship and related matters have had a wide ranging impact on us, including our regulatory supervision, management, business, financial condition, and results of operations.

As our Conservator, FHFA succeeded to all rights, titles,, powers and privileges of Freddie Mac, and of any stockholder, officer or director thereof, with respect to the company and its assets.  FHFA, as conservator, has directed and will continue to direct certain of our business activities and strategies.  FHFA has delegated certain authority to our Board of Directors to oversee, and to management to conduct, day to day operations.  The directors serve on behalf of, and exercise authority as directed by the Conservator.  (**Exhibit 7**, Freddie Mac's 10k Report)

In Intervening Counter-Defendant's Reply Memorandum Brief in Support of Its Motion to Dismiss, in the case of *Herron v Fannie Mae,* 10-00943, U. S. District Court for the District of Columbia, the FHFA wrote that it did not dispute its control over Fannie Mae, which is identical to its control over Freddie Mac in the present case.  It stated:

FHFA, in its capacity as Conservator of Fannie Mae, presently controls Fannie Mae; the statutory function and inherent purpose of financial institution conservators and receivers is to direct the entity in conservatorship or receivership. (**Exhibit 8,** Intervening Counter-Defendant's Reply Memorandum, p. 1 excerpt)

**B.     The FHFA's Control Over Freddie Mac Is Distinguished From The A Receiver's Control Over A Failed Bank**

While acknowledging the FHFA's control over the operations of Freddie Mac, Counter-Defendants argue that such control is insufficient to make Counter-Defendants state actors for constitutional purposes.  They cite to *O'Melveny & Myers v Federal Deposit Insurance Corporation,* 512 U.S. 79; 114 S Ct 2048; 129 L. Ed 2d 67 (1994), where the court held when the FDIC took over a failed bank it stepped into the shoes of the bank, and therefore state and not federal law governed it duties.  Similarly, Counter-Defendants cite *U.S v Beszborn*, 21 F3d 62

(5th Cir 1994) where the court held that when the Resolution Trust Corporation took over a failed savings and loan, it was not functioning as a government actor subject to constitutional restraints.

However, these cases are distinguished from the present case. The Federal Housing Finance Agency, in its capacity as conservator over Fannie Mae and Freddie Mac, is not taking over an individual bank to protect individual investors and depositors in that bank. Rather, the FHFA has taken over the entire mortgage loan industry, in order to serve a public purpose of guaranteeing continued home ownership and to help millions of homeowners currently facing default on their current mortgage loans from entering foreclosure. In carrying out that public purpose, the FHFA and the institutions under its conservatorships are state actors subject to federal constitutional limitations.

For example, in *Trigo v. Federal Deposit Ins. Corp.,* 847 F.2d 1499, 1503 (11th Cir. Fla. 1988), the court held:

> While federal law controls the rights and liabilities of the FDIC –Corp., state law controls the FDIC when the agency is acting as receiver of a failed bank. When acting in its corporate capacity, the FDIC is operating "under authority derived from a specific statutory scheme passed by Congress in exercise of a 'constitutional function or power' to protect and stabilize the national banking system." *Gunter v. Hutcheson*, 674 F.2d 862, 869 (11th Cir.1982), quoting *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 62 S. Ct. 676, 86 L. Ed. 956 (1942). Hence, federal law applies. See *United States v. Kimbell Foods, Inc*., 440 U.S. 715, 726, 99 S. Ct. 1448, 1457, 59 L. Ed. 2d 711 (1979) (outlining test for determining when federal law governs federal agencies). As receiver of a failed bank, however, the FDIC is not pursuing a strong federal policy. The FDIC as receiver merely takes the place of any receiver that might be appointed under state law. Consequently, when acting as receiver, the FDIC is governed by state law.

Similarly, in *Federal Sav. & Loan Ins. Corp. v. Locke*, 718 F. Supp. 573, 579-580 (W.D. Tex. 1989), the Court recognized this distinction is a case dealing with the Federal Savings and Loan Insurance Corporation, holding:

> Like the Federal Deposit Insurance Corporation ("FDIC "), HN1the FSLIC often acts in two distinct capacities. On the one hand, FSLIC acts as a receiver of a failed thrift, marshalling its assets in order to pay the institution's creditors. In this capacity, FSLIC as receiver merely takes the

9

place of any receiver that might be appointed under state law. On the other hand, in its corporate capacity [**13] FSLIC regulates and monitors the thrift industry, insures eligible deposits, makes insurance payouts, and provides financial assistance to insured thrifts. Several courts have recognized the distinction between their legal capacities. *Godwin v. FSLIC*, 806 F.2d 1290, 1291 n. 1 (5th Cir. 1987); *Womble v. Dixon*, 752 F.2d 80, 81 (4th Cir. 1984); *Gibraltar Building & Loan Ass'n v. State Savings & Loan Ass'n*., 607 F. Supp. 722, 723 n. 2 (N.D.Cal. 1985). When acting in its corporate capacity, FSLIC is operating as a distinctly separate entity from its receivership capacity, pursuant to authority derived from a specific statutory scheme passed by Congress in the exercise of a constitutional function or power to protect and stabilize the national savings and loan system. Godwin, 806 F.2d at 1291 n. 1. There is a similar line of cases distinguishing between the Federal Deposit Insurance Corporation acting in its corporate and receivership capacities. See *FDIC v. Ashley*, 585 F.2d 157, 161 (6th Cir. 1978) (FDIC acts in dual capacity as receiver and purchaser of failed bank assets); *Freeling v. Sebring*, 296 F.2d 244, 245 (10th Cir. 1961); [**14] *Trigo v. FDIC*, 847 F.2d 1499 (11th Cir. 1988); *Gunter v. Hutcheson*, 674 F.2d 862 (11th Cir.), cert. denied, 459 U.S. 826, 103 S. Ct. 60, 74 L. Ed. 2d 63 (1982).

And in *Gaff v FDIC*, 919 F2d 384, 387 (6th Cir 1990), the Sixth Circuit similarly held, "In the context of the FDIC, courts have consistently applied federal law to this federal entity when it operates in its corporate capacity or liquidates a national bank."

The purpose behind the FHFA conservatorship over Fannie Mae and Freddie Mac is to stabilize the entire mortgage lending industry which was facing collapse and is still in a precarious situation.  As stated in the appendix to the FHFA's report to Congress dated February 21, 2012:

> The operations of the Enterprises in conservatorship are unlike the country has experienced.  The conservatorship structure was designed to allow a temporary period to stabilize and return the market or to lead to an orderly disposition of a firm.  **Unlike the banking industry, there are not thousands of potential firms ready to step into the business of mortgage securitization.  Indeed, outside of the securitization available through the Government National Mortgage Association (Ginnie Mae) for loans primarily backed by FHA, there is little else in place today to assume the secondary market functions served by the Enterprises**. (emphasis added)

The Appendix further notes that since the FHFA takeover of Fannie Mae and Freddie Mac:

10

The two companies have received more than $180 billion in taxpayer support. The benefit to the country from maintaining their operations has been to ensure the secondary mortgage market continues to function. During this time, the Enterprises (Fannie Mae and Freddie Mac) have completed more than 2 million foreclosure prevention actions, including more than 1 million loan modifications and they have refinanced more than 10 million mortgages. Together they are guaranteeing $100 billion per month in new mortgage production, representing about 3 of every 4 mortgages being originated. But the Enterprises' ongoing operations are entirely dependent on taxpayer support provided through the Senior Preferred Stock Purchase Agreements with the U.S. Department of Treasury. (**Exhibit 9,** Appendix to FHFA Report to Congress)

The conservatorship of the FHFA over Freddie Mac and Fannie Mae is not at all comparable to the receivership of the FDIC over an individual bank geared to protect individual investors. It is the takeover of the entire mortgage loan system in the U.S., with the public purpose of preserving home ownership and of relief to the millions of Americans facing foreclosure through loss mitigations efforts (albeit recognizing that these efforts have sabotaged and continue to be sabotaged by the FHFA's reliance on the same banks who wrote the fraudulent mortgages to service the loans on its behalf).

The idea that institutions that have taken over the entire mortgage loan industry in the U.S. with hundreds of billions of taxpayer dollars paying for their activities should not be subject to the constitutional restraints imposed on the federal government is incomprehensible and completely unlawful.

**C.    The "Permanent Authority' Factor Of Lebron Is Misconstrued By Counter-Defendants And The Factor Is Satisfied By Plaintiffs In The Present Case**

In *Lebron*, 513 U.S. at 399, the Court held:

> We hold that HN4where, as here, the Government creates a corporation by special law, for the furtherance of governmental objectives, and retains for itself permanent authority to appoint a majority of [***923] the directors of that corporation, the corporation is part of the Government for purposes of the [**975] First Amendment.

In *Lebron, supra,* the Court explained what it meant by the "retains permanent authority" factor, holding:

11

Amtrak is not merely [**974] in the temporary control of the Government (as a private corporation whose stock comes into federal ownership might be); it is established and organized under federal law for the very purpose of pursuing federal governmental objectives, under the direction and control of federal governmental appointees. It is in that respect no different from the so-called independent regulatory agencies such as the Federal Communications Commission or the Securities Exchange Commission, which are run by Presidential appointees with fixed terms. It is true that the directors of Amtrak, unlike commissioners of independent regulatory agencies, are not, by the explicit terms of the statute, removable by the President for cause, and are not impeachable by Congress. **But any reduction in the immediacy of accountability for Amtrak directors vis-a-vis regulatory commissioners seems to us of minor consequence for present purposes – especially since, by the very terms of the chartering Act, Congress's "right to repeal, alter, or amend this chapter at any [***922] time is expressly reserved." 45 U.S.C. § 541.** . . .

Respondent also invokes our decision in the *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 42 L. Ed. 2d 320, 95 S. Ct. 335 (1974), which found the Consolidated Rail Corporation, or Conrail, not to be a federal instrumentality, despite the President's power to appoint, directly or indirectly, 8 of its 15 directors. See *id*., at 152, n. 40; Regional Rail Reorganization Act of 1973, § 301, 87 Stat. 1004. But we specifically observed in that case that the directors were placed on the board to protect the United States' interest "in assuring payment of the obligations guaranteed by the United States," and that "full voting control . . . will shift to the shareholders if federal obligations fall below 50% of Conrail's indebtedness." 419 U.S. at 152. Moreover, we noted, "the responsibilities of the federal directors are not different from those of the other directors – to operate Conrail at a profit for the benefit of its shareholders," ibid. – which contrasts with the public interest "goals" set forth in Amtrak's charter, see 45 U.S.C. § 501a. **Amtrak is worlds apart from Conrail: The Government exerts its control not as a creditor but as a policymaker, and no provision exists that will automatically terminate control upon termination of a temporary financial interest.** *Lebron,* 513 U.S. at 398, 399.

Thus, a plain reading of *Lebron*, supra makes clear that the "permanent authority" factor for determining when a government corporation becomes a state actor is met when the corporation is under direction and control of the federal government, when the government exercises that control as a policy maker and not just as a creditor, when there is no provision automatically terminates that control, and when the decision on termination of control is reserved by Congress.

12

All of these elements for meeting the "permanent authority" factor of *Lebron, supra* are satisfied in the present case. As outlined above, the federal government, through the FHFA, exercises complete direction and control over the operation over Counter-Defendant Freddie Mac. (*See, See,* **Exhibits 4-8**) The conservatorship was established for a public purpose, both to stabilize the entire mortgage loan industry in the United States as well as to create programs to facilitate help for the millions of homeowners facing foreclosure. (*See,* **Exhibits 8-9**) There is no specified date for the termination of the FHFA's conservatorship over Freddie Mac, and any determinations on the future role and structure of Freddie Mac will be determined by the federal government administration and Congress. (*See,* **Exhibits 8-9**)

Unlike a short-term receivership when the FDIC takes over a failed bank, the FHFA conservatorship over Freddie Mac and Fannie Mae has already lasted for three and one-half years. And the 2012 report by the FHFA to Congress makes clear that there is no end in sight. The Appendix to the Report reads in part:

> Three years into conservatorship, it is time to update and extend the goals of conservatorship in light of FHFA's statutory mandate and the market environment that has evolved since 2008. As noted the operations of the Enterprises in conservatorship are unlike anything the country has experienced. The conservatorship structure was designed to allow a temporary period for an institution to stabilize and return to the market or to lead to an orderly disposition of a firm. Unlike the banking industry, there are not thousands of potential firms ready to step into the business of mortgage securitization. Indeed, outside of the securitization available through the Government National Mortgage Association (Ginnie Mae) for loans primarily backed by FHA, there is little else in place to assume the secondary market functions served by the Enterprises. . . .
> The Enterprises losses are of such magnitude that the companies cannot repay taxpayers in any foreseeable scenario. . . .
> Congress and the Administration have not reached consensus on how to resolve the conservatorships and define a path for housing finance. Legistlative proposals have begun to emerge, but enactment soon appears unlikely. (*See,* **Exhibit 9**)

It is clear that the FHFA does not fit the typical model for a conservatorship, with a temporary takeover for a relatively short period with fixed events determining the termination of the conservatorship when debts are paid off. The FHFA takeover of Freddie Mac and Fannie

13

Mae is an attempt to deal with the complete collapse of the mortgage industry, to insure home lending and refinancing continues in the U.S., with no end in sight for the takeover, no fixed event leading to termination, and termination and the form of termination of the conservatorships and the future of Freddie Mac and Fannie Mae to be determined by the federal government and only when the federal government makes the determination that such a termination is feasible.

The FHFA takeover satisfies the "permanent authority" factor of *Lebron, supra*.

In addition, permanence is always a relative term.  In *Lebron, supra*, the U.S. Supreme Court reviews the history of "government corporations" which were created and then terminated based on numerous factors, including the political will and climate of a particular period, but which were still considered state actors during the period of their existence.

**D.**  **Pursuant To The 5th Amendment Of The U.S. Constitution, Counter-Plaintiffs Were Entitled To A Hearing Prior To Being Deprived Of Their Property.**

The Fifth Amendment to the U.S. Constitution states:

> No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

The U.S. Supreme Court has reiterated in numerous cases the principle that to satisfy the due process clause, a deprivation of property by the government requires at the minimum notice and a hearing.  In present case, a foreclosure carried out by a state actor pursuant to the Michigan foreclosure statutes, which provide for non-judicial foreclosure based on posting and publication, but without hearing, violates the due process clause and must be declared void.

In *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 433-434 (U.S. 1982), the U.S. Supreme court held:

> As our decisions have emphasized time and again, the Due Process Clause grants the aggrieved party the opportunity to present his case and have its

14

merits fairly judged. Thus it has become a truism that "some form of hearing" is required before the owner is finally deprived of a protected property interest. *Board of Regents v. Roth*, 408 U.S., at 570-571, n. 8 (emphasis in original). And that is why the Court has stressed that, when a "statutory scheme makes liability an important factor in the State's determination . . . , the State may not, consistent with due process, eliminate consideration of that factor in its prior hearing." [*434] *Bell v. Burson*, 402 U.S., at 541. To put it as plainly [**1157] as possible, the State may not finally destroy a property interest without first giving the putative owner an opportunity to present [***277] his claim of entitlement. N7 See id., at 542.

In *Sniadach v. Family Fin. Corp.*, 395 U.S. 337, 341-342 (U.S. 1969), the Supreme Court

held that a prejudgment garnishment without a hearing violated the due process clause, holding:

The result is that a prejudgment garnishment of the Wisconsin type may [**1823] as a practical matter drive a wage-earning [*342] family to the wall. N9 Where the taking of one's property is so obvious, it needs no extended argument to conclude that absent notice and a prior hearing (cf. Coe v. Armour Fertilizer Works, 237 U.S. 413, 423) this prejudgment garnishment procedure violates the fundamental principles of due process.

And in *Fuentes v. Shevin*, 407 U.S. 67, 92-97 (U.S. 1972), the Court held that

prejudgment replevin violated the due process clause.

We hold that the Florida and Pennsylvania prejudgment replevin provisions work a deprivation of property without due process of law insofar as they deny the right to a prior opportunity to be heard before chattels are taken from their possessor. N32 Our holding, however, is a narrow one. We do not question the power of a State to seize goods before a final judgment in order to protect the security interests of creditors so long as those creditors have tested their claim to the goods through the process of a fair prior hearing. The nature and form of such prior hearings, moreover, are legitimately open to many potential variations and are a [*97] subject, at this point, for legislation – not adjudication. N33 Since the essential reason for the requirement of a prior hearing is to prevent unfair and mistaken deprivations of property, however, it is axiomatic that the hearing must provide a real test. HN25 "Due process is afforded only by the kinds of 'notice' and 'hearing' [**2003] that are aimed at establishing the validity, or at least the probable validity, of the underlying claim against the alleged debtor before he can be deprived of his property . . . ."

In *Gilbert v Homar*, 520 U.S. 924, 117 S. Ct 1807, 134 L. Ed. 2d 120 (1997), the Court

held that under the exceptional circumstances of that case, where a tenured police officer was

arrested and charged with a felony, a suspension without pay without a hearing was justified,

where a post-suspension hearing would still be provided.  Gilbert is clearly distinguished from the present case based on its extreme circumstances.  In addition, the Michigan non-judicial foreclosure regimen offers **no** opportunity for a hearing, pre or post Sheriff's sale.

*Sutton v U.S. Small Business Administration*, 92 Fed. Appx 112, 2003 US App LEXIS 25694, an unpublished Sixth Circuit decision, seems to misapply *Gilbert*, supra, by allowing a foreclosure by the government without any hearing, unlike Gilbert which mandated at least a post suspension.

In addition, *Sutton* rests on the presumption that the risk of an erroneous deprivation of property is minimal after a default.  In the present case, the foreclosure is on a Freddie Mac property.  Federal regulations mandate that a homeowner in a Freddie Mac owned or backed property is entitled to be evaluated for a loan modification prior to foreclosure, and that foreclosure be suspended while the homeowner engages in the modification process.  Unfortunately, because the banks act as servicers on Freddie Mac loans, it is well documented that millions of homeowners are being denied modifications to which they should be entitled.  In fact, the recent consent judgment between the federal government and attorney generals with the major banks, including Wells Fargo, the servicer in this case, specifically addresses this issue.  In addition, in the present case, Plaintiffs actually entered a trial modification of their loan, made the payments pursuant to the modification, and still were subjected to foreclosure.  It is precisely because of errors like this in the foreclosure process that homeowners in government owned loans must be offered their due process protections in order for the governmental objectives to be achieved.

Because the cases cited by Counter-Defendants in the non-binding decisions attached to their brief were based the issues already discussed, Counter-Plaintiffs will not specifically address them in this brief.

For the reasons stated herein, Plaintiffs' 5th Amendment due process rights were violated by the non-judicial foreclosure of their home.

### III.   COUNTER-PLAINTIFFS HAVE PROPER STANDING TO CHALLENGE THE LEGITIMACY OF THE FORECLOSURE AND RAISE BREACH OF CONTRACT

Counter-Plaintiffs have proper standing to raise the issue of the improper foreclosure of their property.  The Eastern District of Michigan determined a plaintiff in a mortgage case has standing, stating:

> The defendants, relying on *Overton v. Mortgage Elec. Registration Sys. & Citimortgage*, No. 284950, 2009 Mich. App. LEXIS 1209, 2009 WL 1507342 (Mich. Ct. App. May 28, 2009), argue that the plaintiffs do not have standing because they no longer retain a legal interest in the subject property because the redemption period has expired. There is no merit to that argument. First, the defendants' argument relies on an incorrect notion of standing. District Judge Robert Jonker, in *Langley v. Chase Home Finance LLC*, No. 10-604, 2011 U.S. Dist. LEXIS 32845, 2011 WL 1130926, at *2 n.2 (W.D. Mich. Mar. 28, 2011), aptly explained the defendants' mistake: ***Many Defendants suggest the basis for the ruling in Overton is a lack of Plaintiff's standing once the redemption period expires, but the Court of Appeals does not actually say this. Nor would it seem like Article III standing could possibly be in doubt. After all, the Plaintiffs in such cases are the last lawful owner and possessor of the property. Moreover, they often remain in continuing possession of the property notwithstanding any Sheriff's sale and expiration of a redemption period.*** Moreover, Plaintiffs in such cases claim a continuing right to lawful ownership and possession based on defects in the process used by Defendants to divest them of those rights. This certainly seems to satisfy the basic Article III requirement of "injury in fact," as well as any prudential considerations tied to a "zone of interests" analysis. ***Indeed, it is hard to imagine a person with a better claim to standing to challenge the process at issue.*** Of course, having standing to bring a claim does not mean you have a valid claim on the merits. That is a different question. Overton is best viewed as a merits decision, not a standing case.  *Langley*, 2011 U.S. Dist. LEXIS 32845, 2011 WL 1130926, at *2 n.2.
>
> Second, "[t]he [Michigan] Supreme Court has long held that the mortgagor may hold over after foreclosure by advertisement and test the validity of the sale in the summary proceeding." *Manufacturers Hanover Mortgage Corp. v. Snell*, 142 Mich. App. 548, 553, 370 N.W.2d 401, 404 (1985) (citing *Reid v. Rylander*, 270 Mich. 263, 267, 258 N.W. 630 (1935); Gage v. Sanborn, 106 Mich. 269, 279, 64 N.W. 32 (1895)). "Otherwise, the typical mortgagor who faces an invalid foreclosure would be without remedy, being without the financial means to pursue the alternate course of filing an independent action to restrain or set aside the

17

sale." Ibid. (citing *Reid*, 270 Mich. at 267, 258 N.W. 630; 16 Michigan Law and Practice, Mortgages, § 174, pp. 438-39).

> ***The defendants' standing argument must be rejected. T***he plaintiffs allege continuing ownership of the Property, Compl. ¶ 7, and satisfy the constitutional and prudential standing requirements. There is no question that the plaintiffs have standing to bring their claims.  (**Exhibit 10,** *Rainey v. United States Bank Nat'l Ass'n*, 2011 U.S. Dist. LEXIS 123347, 5-8 (E.D. Mich. Oct. 25, 2011)) (emphasis added)

This position has been reiterated by the Eastern District of Michigan,

> The *Piotrowski* case has been cited in more recent state and federal decisions addressing standing relative to a sheriff's sale. See *Overton v. Mortgage Electronic Registration Sys., Inc.,* No. 284950, 2009 Mich. App. LEXIS 1209, 2009 WL 1507342, at *1 (Mich. Ct. App. May 28, 2009); *Kama v. Wells Fargo Bank*, No. 10-10514, 2010 U.S. Dist. LEXIS 115543, 2010 WL 4386974, at *2 (E.D. Mich. Oct. 29, 2010) (Hood, J .); *Smith v. Wells Fargo Home Mortgage, Inc*., No. 09-13988, 2010 U.S. Dist. LEXIS 133957 (E.D. Mich. August 16, 2010) (Steeh, J.); see also MICH. ***COMP. LAWS § 600.3236. *Wells Fargo* concludes that, based upon this authority, Plaintiffs lack standing to challenge the foreclosure and/or sheriff's sale inasmuch as redemption period expired in July 2010.
>
> The Court disagrees. Defendant's brief fails to address the exception carved out by  [*8] Michigan courts. In *Manufacturers Hanover Mortgage Corp. v. Snell*, 142 Mich. App. 548, 370 N.W.2d 401, 404 (Mich. Ct. App. 1985), the appellate court noted that a mortgagor could challenge an invalid foreclosure by advertisement by raising equitable defenses to a summary eviction proceedings. The Supreme Court has long held that the mortgagor may hold over after foreclosure by advertisement and test the validity of the sale in the summary proceeding. *Reid v. Rylander*, 270 Mich. 263, 267, 258 N.W. 630 (1935); Gage v. Sanborn, 106 Mich. 269, 279, 64 N.W. 32 (1895). Otherwise, the typical mortgagor who faces an invalid foreclosure would be without remedy, being without the financial means to pursue the alternate course of filing an independent action to restrain or set aside the sale. Reid, supra, 270 Mich. p. 267, 258 N.W. 630; see also, 16 Michigan Law and Practice, Mortgages, § 174, pp. 438-439. The mortgagor may raise whatever defenses are available in a summary eviction proceeding. M.C.L. § 600.5714; M.S.A. § 27A.5714; 554, *Federal National Mortgage Ass'n v. Wingate*, 404 Mich. 661, 676 fn. 5, 273 N.W.2d 456 (1979).Id.
>
> In addition, in *United States v. Garno*, 974 F. Supp. 628, 633 (E. D. Mich. 1997), the  [*9] district court held that under Michigan law, "a very good reason" may mandate setting aside a foreclosure sale. Accord *Markoff v. Tournier*, 229 Mich. 571, 201 N.W. 888, 889 (Mich. 1925) (noting that a foreclosure sale may be set aside for fraud or irregularity). (**Exhibit 11,**

*Nett v. Wells Fargo Home Mortg. Inc.*, 2011 U.S. Dist. LEXIS 42846, 6-9
(E.D. Mich. Apr. 20, 2011))

In the instant matter, the foreclosure was not conducted pursuant to statute, as MCL 600.3204 has been incorporated by statute into the foreclosure process, and there was an express breach of contract.  Counter-Defendants' motion must be denied.

### IV.   COUNTER-PLAINTIFFS'   COMPLAINT   ALLEGES SUFFICIENT  FACTS  WITH  ADEQUATE   SPECIFICITY TO SUPPORT THEIR CLAIMS

Counter-Plaintiffs' complaint not only pleads sufficient facts to withstand Fed.R.Civ.P. Rule 12(c) motion, but also provides the specificity and particularity to meet the stands of Fed.R.Civ.P. Rule 9(b).  Counter-Defendants contend Counter-Plaintiff's claims are insufficient factually and do not provide fair notice.  This is untrue.  Counter-Plaintiffs attached **eleven (11)** exhibits to their complaint that specifically went with the allegations against Counter-Defendant. Counter-Defendant cannot state it did not have notice of any claim brought by Counter-Plaintiffs. Specifically, Counter-Plaintiffs asserted Counter-Defendants misrepresented Counter-Plaintiffs were being placed in a trial modification and if the three trial modification payments were made Counter-Plaintiffs would be placed in a permanent modification.   The trial modification agreement is attached to Counter-Plaintiffs' complaint as Exhibit 7 and payments were made on the trial modification, and are attached to Counter-Plaintiffs' complaint as Exhibit 8.

Counter-Defendants' motion must be denied with respect to the claim of misrepresentation and fraudulent inducement.

### CONCLUSION

Counter-Plaintiffs sought and received a trial modification from Counter-Defendants' predecessor servicer Wells Fargo.  Counter-Plaintiffs made payments pursuant to the express terms of the trial modification agreement.  Counter-Plaintiffs' payments were accepted, **and the successful completion of the trial modification confirmed by Wells Fargo.**  Counter-Defendants have not submitted any legal authority that would preclude the Counter-Plaintiffs

19

from moving forward on their claims.  Moreover, Counter-Plaintiffs clearly establish Counter-Defendants are state actors and subject to the Fifth Amendment and constitutional due process.

WHEREFORE, Counter-Plaintiffs Enyka Matthew-Gaines and Rico Gaines respectfully requests this Honorable Court to deny Counter-Defendants' motion for judgment on the pleadings under Fed.R.Civ.P. Rule 12(c).

Respectfully submitted,

VANESSA G. FLUKER, ESQ., PLLC

/s/Vanessa G. Fluker
Vanessa G. Fluker (P64870)
Attorney for Defendants/Counter-Plaintiffs
2920 East Jefferson, Suite 101
Detroit, MI  48207
Phone (313) 393-6005
vgflawyer@sbcglobal.net

DATED:  August 24, 2012

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send notification of such filing to all counsels of record.

VANESSA G. FLUKER, ESQ., PLLC

/s/Vanessa G. Fluker
Vanessa G. Fluker (P64870)
Attorney for Defendants/Counter-Plaintiffs
2920 East Jefferson, Suite 101
Detroit, MI  48207
Phone (313) 393-6005
vgflawyer@sbcglobal.net

DATED:  August 24, 2012